## BROWNING v. UNITED STATES. *

(Circuit Court of Appeals, Eighth Circuit. May 9, 1925.)

No. 6489.

1. **Indians ☞35—Term "Indian country," in statute making possession of intoxicating liquor in Indian country an offense, has constantly changing application.**

Term "Indian country" as used in act June 30, 1919, § 1 (Comp. St. Ann. Supp. 1923, § 4137aa), and Act May 25, 1918, § 1 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 4137aa), making possession of intoxicating liquor in Indian country an offense punishable under Act July 23, 1892 (Comp. St. §§ 4136a, 4140), and Act Jan. 30, 1897, § 1 (Comp. St. § 4137), has constantly changing application, and lands that once constituted part of Indian country may cease to be such.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Indian Country.]

2. **Indians ☞35 — Courts construe statutes prohibiting intoxicating liquor in Indian country as showing intention that Indian country should diminish as necessity therefor disappears.**

Defining of Indian country as necessities of situation demand is one of means used by Congress to efficiently carry out its policy of providing for Indians' welfare, and courts construe statutes prohibiting intoxicating liquor in Indian country as showing intention that Indian country should diminish as necessity for its existence disappears, and extinguishment of Indian title to land is practical test to determine whether Indian country has ceased to be such, in absence of action by Congress disclosing different intention.

3. **Indians ☞35—Streets and large part of town site ceased to be "Indian country," within statutes prohibiting intoxicating liquor therein.**

Under Act March 3, 1905, providing for town site of Pawhuska, and Act March 4, 1907, Act June 28, 1906, Act March 3, 1909, Act April 18, 1912, Act March 3, 1921, and Enabling Act

*Certiorari denied 46 S. Ct. 25, 69 L. Ed. —.

6 F.(2d)—51

Okl. June 16, 1906, title to streets and large part of town site of Pawhuska, Osage county, Okl., ceased to be Indian country, within Act June 30, 1919, § 1 (Comp. St. Ann. Supp. 1923, § 4137aa), and Act May 25, 1918, § 1 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 4137aa), making possession of intoxicating liquor in Indian country an offense, if considered independently of Act March 2, 1917, § 17 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 4137a); provision of Enabling Act Okl. June 16, 1906, saving jurisdiction of United States over Indian affairs, and Const. Okl. art. 1, § 3, not being applicable.

4. **Indians ☞35 — Statute declaring Osage county, Okl., to be Indian country held valid, notwithstanding portions thereof had previously lost such status.**

Act March 2, 1917, § 17 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 4137a), providing that Osage county, Okl., shall be deemed to be Indian country within acts making it unlawful to introduce intoxicating liquors into Indian country, is valid exercise of power to regulate commerce with Indian tribes, vested in Congress under Const. art. 1, § 8, and does not violate sovereignty of state of Oklahoma, notwithstanding status of portions of county as Indian country had previously ceased by extinguishment of Indian title.

5. **Commerce ☞6—Power of Congress to regulate commerce with Indian tribes is continuing, and covers intercourse with members of tribe.**

Power of Congress under Const. art. 1, § 8, to regulate commerce with Indian tribes is continuing, and cannot be abdicated, and covers traffic and intercourse, not only with tribes, but with members thereof, though within limits of state.

6. **Commerce ☞6—Allotment of land to and conferring citizenship on Indians does not terminate power of Congress.**

Power of Congress to regulate commerce with Indian tribes is not terminated by mere fact that allotments of land have been made and citizenship conferred on Indians.

7. **Commerce ☞6—In determining validity of exercise of power of Congress, circumstances surrounding exercise considered.**

In determining validity of exercise of power by Congress to regulate commerce with Indian tribes, circumstances surrounding such exercise should be considered.

8. **Indians ☞35—Statutes prohibiting possession of intoxicating liquors in Indian country held not repealed by National Prohibition Act.**

Act June 30, 1919, § 1 (Comp. St. Ann. Supp. 1923, § 4137aa), and Act May 25, 1918, § 1 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 4137aa), making possession of intoxicating liquors in Indian country an offense punishable under Act July 23, 1892 (Comp. St. §§ 4136a, 4140), and Act Jan 30, 1897, § 1 (Comp. St. § 4137), held not repealed by National Prohibition Act (Comp. St. Ann. Supp. 1923, § 10138¼ et seq.).

**9. Criminal law ⊚⇒1044—Sufficiency of evidence will not be considered by Circuit Court of Appeals, in absence of motion for directed verdict.**

Sufficiency of evidence will not be considered by Circuit Court of Appeals, where no motion for directed verdict ·was made in trial court.

In Error to the District Court of the United States for the Western District of Oklahoma; John H. Cotteral, Judge.

John Browning was convicted of having intoxicating liquor in his possession in Indian country, and he brings error. Affirmed.

Roy A. Reynolds, of Tulsa, Okl. (Allen W. Comstock, of Pawhuska, Okl., and· Henry B. Martin, of Tulsa, Okl., on the brief), for plaintiff in error.

W. A. Maurer, U. S. Atty., and James A. Ingraham, ·Asst. U. S. Atty., both of Oklahoma City, Okl.

Before SANBORN and KENYON, Circuit Judges, and BOOTH, District Judge.

BOOTH, District Judge. Plaintiff in error was indicted, tried, and convicted for having in his possession on or about the 19th of February, 1922, intoxicating liquor "in and upon the Indian country, to wit, Osage county, Oklahoma."

The prosecution was had, according to the statement of counsel· for plaintiff in error, under Act June 30, 1919, c. 4, § 1 (41 Stat. 4 [Comp. St. Ann. Supp. 1923, § 4137aa]); but, according to the statement of counsel for defendant in error, under Act May 25, 1918, c. 86, § 1 (40 Stat. 563 [Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 4137aa]), which, so far as here material, reads as follows:

"That on and after September first, nineteen hundred and eighteen, possession by a person of intoxicating liquors in the Indian country where the introduction is or was prohibited by treaty or federal statute shall be an offense and punished in accordance with the provisions of the acts of July twenty-third, eighteen ·hundred and ninety-two (Twenty-Seventh Statutes at Large, page two hundred and sixty), and January thirtieth, eighteen hundred and ninety-seven (Twenty-Ninth Statutes at Large, page five hundred and six)."

We ·deem it immaterial under which act the prosecution was had, since both acts prohibited the possession of intoxicating liquor "in the Indian country" at the time in question, and both acts provided that punishment should be in accordance with the provisions of Act of July 23, 1892 (27 Stat. 260 [Comp. St. §§ 4136a, 4140]), and Act Jan. 30, 1897 (29 Stat. 506 [Comp. St. § 4137]). The two last-mentioned acts prohibited the introduction of liquor into the Indian country, and provided punishment therefor. The penalties in the two acts were not exactly the same, but it has been held by this court that the latter of the two acts was·an amendment of the former, and that the two should be construed together in fixing the maximum and minimum punishment. Morgan v. Ward, 224 F. 698, 140 C. C. A. 238.

The assignments of error are three in number. (1) That the court erred in overruling the demurrer to, the indictment. (2) That the court erred in holding that the Volstead Act (Comp. St. Ann. Supp. 1923, § 10138¼ et seq.) had not repealed the statute under which defendant was convicted. (3) That the verdict was contrary to the law and the evidence.

The legal question sought to be raised by the first and third assignments is whether the locus in quo of the alleged offense was "in and upon the Indian country." Inasmuch as counsel on both sides have assumed that this question was properly raised in the record, we shall so assume, but without so deciding.

The term "Indian country" has been defined by Congress several times and with varying content. As early as 1802 Congress described the boundaries of the Indian country, all of which at that time lay east of the Mississippi river. 2 Stat. 139. By the Act of Congress of June 30, 1834 (4 Stat. 729), the boundaries of the Indian country were defined as follows: "That all that part of the United States west of the Mississippi, and not within the states of Missouri and Louisiana, or the territory of Arkansas, and, also, that part of the United States east of the Mississippi river, and not within any state to which the Indian title has not been extinguished, for the purposes of this act, be taken and deemed to be the Indian country." Section 1.

Referring to this definition of "the Indian country," the Supreme Court said, in the case of Clairmont v. United States, 225 U. S. 551, 557, 32 S. Ct. 787, 788 (56 L. Ed. 1201): "This portion of the act of 1834 was not re-enacted in the Revised Statutes, though other parts of the statute were, and hence was repealed by section 5596 of the revision. But, as has frequently been stated by this court, the definition may still 'be referred to in connection with the provisions of its original context which remain in force, and may be considered in connection with the changes which have taken place in

our situation, with a view of determining from time to time what must be regarded as Indian country where it is spoken of in the statutes.'. Ex parte Crow Dog, 109 U. S. 556, 561 [3 S. Ct. 396, 27 L. Ed. 1030]; United States v. Le Bris, 121 U. S. 278, 280 [7 S. Ct. 894, 30 L. Ed. 946]."

[1] By the Act of Congress of January 30, 1897, c. 109 (29 Stat. 506 [Comp. St. § 4137]) it was provided that the term "Indian country" "shall include any Indian allotment while the title to the same shall be held in trust by the government, or while the same shall remain inalienable by the allottee without the consent of the United States." In short, as this court has said: "The term 'Indian country' has a constantly changing application." Joplin Mer. Co. v. U. S., 213 F. 926, 929, 131 C. C. A. 160, 163 (Ann. Cas. 1916C, 470).

It is undisputed that the place where the alleged offense was committed was one of the public streets of the city of Pawhuska, in Osage county, Okl. It is contended by plaintiff in error that, though Osage county had at one time concededly been Indian country, yet it had ceased to be Indian country long prior to the transaction now in question, or at least that the part of Osage county included in the town site of Pawhuska had ceased to be Indian country.

It is well settled, as contended by plaintiff in error, that lands which at one time have constituted part of the Indian country may cease to be such. In the leading case of Bates v. Clark, 95 U. S. 204, 24 L. Ed. 471, the court, in discussing the Act of June 30, 1834, said:

"What, then, is Indian country, within the meaning of the acts of Congress regulating intercourse with the Indians? * * * The simple criterion is that as to all the lands thus described it was Indian country whenever the Indian title had not been extinguished, and it continued to be Indian country so long as the Indians had title to it, and no longer. As soon as they parted with the title, it ceased to be Indian country, without any further act of Congress, unless by the treaty by which the Indians parted with their title, or by some act of Congress, a different rule was made applicable to the case."

The qualification in the last clause of the foregoing statement had already been illustrated in the case of United States v. 43 Gallons of Whisky, 93 U. S. 188, 23 L. Ed. 846. This was a libel of information by the United States against 43 gallons of whisky and other merchandise, seized under Act June 30, 1834 (4 Stat. 732), as amended by Act March 15, 1864 (13 Stat. 29), which forbade the introduction of intoxicating liquor into the Indian country. It was contended that the seizure was made within the jurisdiction of the state of Minnesota, and not within any Indian country. The seizure was in fact made in the village of Crookston, Polk county, Minn., on February 12, 1872. The land on which Crookston was located had been part of the lands of the Red Lake and Pembina bands of the Chippewa Indians, but had been ceded to the United States by the treaty of October 2, 1863. 13 Stat. 667. Minnesota had theretofore been admitted to the Union, and Polk county had been organized.

The treaty in question contained the following article: "The laws of the United States now in force, or that may hereafter be enacted, prohibiting the introduction and sale of spirituous liquors in the Indian country, shall be in full force and effect throughout the country hereby ceded, until otherwise directed by Congress or the President of the United States." Article 7.

It was contended that the incorporation of this article in the treaty was beyond the power of Congress and was an invasion of the sovereignty of the state of Minnesota. The Supreme Court, however, held the article of the treaty valid and in the course of its opinion said:

"The Indian country, as defined by the act of 1834, was at that date so remote from settlements that there was no occasion to extend the prohibition beyond its limits. It has since then been so narrowed by successive treaties that the white population is now all around it, and regarding it with a wistful eye. In view of this changed condition, it would be strange indeed if the commercial power, lodged solely with Congress and unrestricted as it is by state lines, did not extend to the exclusion of spirituous liquors intended to corrupt the Indians, not only from existing Indian country, but from that which has ceased to be so, by reason of its cession to the United States.

"The power to define originally the 'Indian country,' within which the unlicensed introduction and sale of liquors were prohibited, necessarily includes that of enlarging the prohibited boundaries whenever, in the opinion of Congress, the interests of Indian intercourse and trade will be best subserved. * * * This stipulation was not only reasonable in itself, but was justly due from a strong government to a weak people it had engaged to protect. It is not easy to see how it infringes upon the position of equality which Minnesota holds

with the other states. The principle that federal jurisdiction must be everywhere the same, under the same circumstances, has not been departed from. The prohibition rests on grounds which, so far from making a distinction between the states, apply to them all alike. The fact that the ceded territory is within the limits of Minnesota is a mere incident; for the act of Congress imported into the treaty applies alike to all Indian tribes occupying a particular country, whether within or without state lines. Based as it is exclusively on the federal authority over the subject-matter, there is no disturbance of the principle of state equality. * * * The federal government may, in the exercise of its acknowledged power to treat with Indians, make the provision in question, coming, as it fairly does, within the clause relating to the regulation of commerce."

Dick v. U. S., 208 U. S. 340, 28 S. Ct. 399, 52 L. Ed. 520, was an indictment under Act July 23, 1892 (27 Stat. 260), for unlawfully introducing intoxicating liquor into the Indian country, to wit, into and upon the 'Nez Perce Indian reservation in the county of Nez Perce, state of Idaho, on or about March 13, 1905. Demurrer was interposed on the grounds:

"That at the time charged in the indictment there was no Indian country within the county of Nez Perce, or within the district of Idaho, known or designated as the Nez Perce Indian reservation; that the jurisdiction of the United States over all the country and territory embraced within the former reservation known and designated as the Nez Perce Indian reservation was, by the act admitting Idaho as a state into the Union, relinquished to the state of Idaho, excepting only that jurisdiction was retained in the United States over such Indian reservation until the Indians' title to the lands included within the boundary of such reservation should be extinguished; that the Indian or tribal title to the lands therein contained has, since the admission of the state, been extinguished by the allotment of the lands in severalty to the individual Indians and by the purchase of the balance thereof by the United States, and that such allotments and purchase have been ratified by the public laws and acts of Congress; * * * that various town sites within the boundaries of the former reservation had been settled by citizens, and that title thereto transferred from the United States to the inhabitants; and that municipal governments, namely, villages, had been organized and were in existence within

the boundaries of the former reservation; and that the same, nor any part thereof, is not, and was not at the times mentioned in the indictment, Indian country."

It appeared that under Act Feb. 8, 1887, c. 119, § 5 (24 Stat. 389 [Comp. St. § 4201]), lands allotted in severalty to Indians were to be held in trust by the United States for twenty-five years, for the sole use and benefit of the Indian allottees or their heirs.

It further appeared that Idaho was admitted to the Union in 1890. Act July 3, 1890, c. 656 (26 Stat. 215). The act contained no provision about Indian lands or reservations, but the Constitution of Idaho (article 21, § 19) contained the following provision:

"And the people of the state of Idaho do agree and declare that we forever disclaim all right and title to the unappropriated public lands lying within the boundaries thereof, and to all lands lying within said limits, owned or held by any Indians or Indian tribes; and until the title thereto shall have been extinguished by the United States, the same shall be subject to the disposition of the United States, and said Indian lands shall remain under the absolute jurisdiction and control of the Congress of the United States."

It further appeared that the offense charged in the indictment, occurred in the village of Culdesac, that this was an organized village of the state, that the lands upon which the village was located were part of those ceded by the Indians to the United States by the agreement of May 1, 1893 (28 Stat. 326), and that title to said lands had passed from the United States to the probate judge of Nez Perce county, in trust, for the inhabitants of the village.

It further appeared that by the agreement of May 1, 1893, it was provided (article IX):

"It is further agreed that the lands by this agreement ceded, those retained, and those allotted to the said Nez Perce Indians shall be subject, for a period of twenty-five years, to all the laws of the United States prohibiting the introduction of intoxicants into the Indian country, and that the Nez Perce Indian allottees, whether under the care of an Indian agent or not, shall, for a like period, be subject to all the laws of the United States prohibiting the sale or other disposition of intoxicants to Indians."

The contention was made that Congress was without constitutional authority to authorize the agreement of 1893 with the Indians or to ratify the same; that the effect

of such an agreement would be to establish a divided sovereignty over certain definite territory and deprive the state of full police control of its own citizens within its own territory. The court reaffirmed the rule announced in Bates v. Clark, cited with approval the case of United States v. 43 Gallons of Whisky, and held that Congress had power to make the agreement of 1893, saying:

"In determining the extent of the power of Congress to regulate commerce with the Indian tribes, we are confronted by certain principles that are deemed fundamental in our governmental system. One is that a state, upon its admission into the Union, is thereafter upon an equal footing with every other state, and has full and complete jurisdiction over all persons and things within its limits, except as it may be restrained by the provisions of the federal Constitution or by its own Constitution. Another general principle, based on the express words of the Constitution, is that Congress has power to regulate commerce with the Indian tribes, and such power is superior and paramount to the authority of any state within whose limits are Indian tribes. These fundamental principles are of equal dignity, and neither must be so enforced as to nullify or substantially impair the other. In regulating commerce with Indian tribes, Congress must have regard to the general authority which the state has over all persons and things within its jurisdiction. So the authority of the state cannot be so exerted as to impair the power of Congress to regulate commerce with the Indian tribes."

Clairmont v. U. S., 225 U. S. 551, 32 S. Ct. 787, 56 L. Ed. 1201, involved an indictment under Act Jan. 30, 1897 (29 Stat. 506), for introducing intoxicating liquor "into the Flathead Indian reservation, in the state and district of Montana"; the said reservation "being an Indian country." It appeared that the alleged offense was committed by a person having intoxicating liquor in his possession on a railroad train running on the right of way of the Northern Pacific Railroad Company through a piece of land which formerly had been part of the Flathead Indian reservation, a district within the present boundaries of the state of Montana. It further appeared that the Enabling Act of 1889, under which the state was formed, provided:

"That the people inhabiting" the proposed state "do agree and declare that they forever disclaim all right and title to the unappropriated public lands lying within the boundaries thereof, and to all lands lying within

said limits owned or held by any Indian or Indian tribes, and that, until the title thereto shall have been extinguished by the United States, the same shall be and remain subject to the disposition of the United States, and said Indian lands shall remain under the absolute jurisdiction and control of the Congress of the United States." 25 Stat. 677, § 4, subd. 2.

It further appeared that by grant of Congress the railroad company had obtained the fee in the right of way, and that by virtue of an agreement between the United States and the Indians, entered into September 2, 1882, this land constituting the right of way was freed from the Indian right of occupancy. In view of these facts the Supreme Court held that the strip of land constituting the right of way could no longer be considered Indian country. In its opinion the court said:

"That the effect of a cession by the Indians might be qualified by a stipulation in the treaty that the ceded territory, although within the boundaries of a state, should retain its original status of Indian country so far as the introduction into it of intoxicating liquors was concerned was decided in United States v. Forty-Three Gallons of Whisky, etc., 93 U. S. 188 [23 L. Ed. 846], 108 U. S. 491 [2 S. Ct. 906, 27 L. Ed. 803]. But, as was pointed out in Bates v. Clark, supra, that decision proceeded upon the hypothesis that, 'when the Indian title is extinguished, it ceases to be Indian country, unless some such reservation takes it out of the rule.' The same principle of decision was recognized in Dick v. United States, 208 U. S. 340 [28 S. Ct. 399, 52 L. Ed. 520]."

And further: "In the present case there was no provision, either in the treaty with the Indians, or by act of Congress, which limited the effect of the surrender of the Indian title. * * * The Indian title or right of occupation was extinguished, without reservation; and the relinquished strip came under the jurisdiction of the then territory and later under that of the state of Montana."

The case of Evans v. Victor, 204 F. 361, 122 C. C. A. 531, was a bill in equity to restrain the United States marshal and another officer from repeating, as was threatened, searches of plaintiff's drug store in the city of Muskogee, Okl., without a warrant. The defense was that the drug store was in the Indian country and that the search was lawful by virtue of sections 2139, 2140, R. S. (Comp. St. §§ 4136a, 4141), Act March 1, 1907 (34 Stat. 1017 [Comp. St. § 4142]),

and Act March 1, 1895, c. 145 (28 Stat. 697 [Comp. St. § 4136b]). The court stated in its opinion, the issue thus: "The defendants had no authority to make the search which they made and those they threaten to make, unless the land in the city of Muskogee on which the plaintiff's drug store was located was in the Indian country."

It appeared that under Act June 28, 1898, c. 517 (30 Stat. 495), and the Creek Agreement (Act March 1, 1901 [31 Stat. 861, 866, 867]), authorizing the platting, appraisal, and sale of the land within the corporate limits of Muskogee, the Indian title to the land in question had been extinguished. This court, in an exhaustive opinion by Judge Sanborn, reviewed the authorities and reached the conclusion that, the land in question was not Indian country; that the provision contained in the Creek Agreement, "The United States agrees to maintain strict laws in said nation against the introduction, sale, barter, or giving away of liquors or intoxicants of any kind," did not and was not intended to make the land in question Indian country. The court reaffirmed the rule announced in Bates v. Clark, saying:

"Lands once Indian country remain such as long as the Indians retain their original title, and, in the absence of a different provision by treaty, or by act of Congress, cease to be Indian country whenever that title is extinguished. The original Indian title to the land on which the plaintiff's drug store stands had been extinguished many years before the search made by the defendants. No provision of any treaty or act of Congress to the effect that the land on which this drug store stands, or the lands within the original corporate limits of the city of Muskogee, should not cease to be Indian country on the extinguishment of the Indian title thereto, * * * has been cited, nor has a diligent search disclosed any."

The same rule is recognized in Schaap v. U. S., 210 F. 853, 127 C. C. A. 415.

[2] It is apparent from the legislation above outlined, and from the foregoing decisions construing the same:

(1) That the defining of Indian country by Congress has been simply one of the means used by that body for efficiently carrying out its policy of providing for the welfare of the Indians, as wards of the nation.

(2) That the content of the definition of Indian country has been determined from time to time by Congress according to the necessities of the situation.

(3) That the courts have construed these acts of Congress as evincing an intention on the part of that body that the Indian country should diminish as the necessity for its existence disappeared, and the courts have adopted the extinguishment of the Indian title to the land as a practical test to determine whether Indian country has ceased to be such, in the absence of any action on the part of Congress to disclose a different intention.

(4) That if such different intention has been disclosed by Congress, either by a treaty or by an act of Congress, as in United States v. 43 Gallons of Whisky, supra, and Dick v. United States, supra, then the courts in their decisions have been guided by such intention, even though the Indian title to the land under consideration had been extinguished. U. S. v. 43 Gallons of Whisky, supra.

[3] In the case at bar it is contended by plaintiff in error that the Indian title to the streets of Pawhuska, and to most of the land comprising the town site of Pawhuska, had been extinguished, and that Osage county had become organized as a county of the state of Oklahoma, long prior to February, 1922, the date of the alleged offense. This is not denied on the part of the government; and that such was in fact the situation seems clear, in view of the Act of Congress of March 3, 1905 (33 Stat. 1048, 1061), providing for the town site of Pawhuska; Act March 4, 1907 (34 Stat. 1376), ratifying the incorporation of the city of Pawhuska; Act June 28, 1906 (34 Stat. 539), providing for the division of the lands and funds of the Osage Indians; Act March 3, 1909 (35 Stat. 778), authorizing the Secretary of the Interior to sell surplus lands of the Osage Tribes; Act April 18, 1912 (37 Stat. 86), authorizing the partition or sale of inherited Osage Indian lands; Act March 3, 1921 (41 Stat. 1249), declaring all members of the Osage tribe to be citizens of the United States and removing restrictions against alienation of adult Osage Indians of less than one-half Indian blood; and the Enabling Act for Oklahoma of June 16, 1906, (34 Stat. 267). Oklahoma was admitted as a state in 1907.

It is true that the Enabling Act for Oklahoma contained a clause: "That nothing contained in the said Constitution shall be construed to limit or impair the rights of person or property pertaining to the Indians of said territories (so long as such rights shall remain unextinguished), or to limit or affect the authority of the government of the United States to make any law or regulation respecting such Indians, their

lands, property or other rights by treaties, agreement, law or otherwise, which it would have been competent to make if this act had never been passed." Section 1.

And the Constitution of Oklahoma (article 1) contained a provision: "Sec. 3. The people inhabiting the state do agree and declare that they forever disclaim all right and title in or to any unappropriated public lands lying within the boundaries thereof, and to all lands lying within said limits owned or held by any Indian, tribe, or nation; and that until the title to any such public land shall have been extinguished by the United States, the same shall be and remain subject to the jurisdiction, disposal, and control of the United States."

But these provisions, so far as they related to the status of lands, had reference only to lands to which the Indian title had not been extinguished and to unappropriated public lands, and are therefore not applicable to the instant case. In view of the foregoing legislation and decisions construing the same, it must be conceded that the streets of Pawhuska, including the locus in quo of the alleged offense, and a large part of the town site, had ceased to be Indian country many years prior to the commission of the alleged offense, and also that Osage county had become an organized county of the state of Oklahoma years prior to that time.

At this point we may properly repeat with slight paraphrase the remarks of the court in Dick v. U. S., supra. If this case depended alone upon the federal liquor statutes forbidding the introduction of intoxicating drinks into the Indian country, or the possession thereof therein, we should feel obliged to adjudge that the trial court erred in taking jurisdiction; for those statutes when enacted did not intend by the words "Indian country" to embrace any body of territory in which at the time the Indian title had been extinguished and over which, and over the inhabitants of which, the jurisdiction of the state, for all purposes of government, are full and complete. But this case does not depend upon the construction of the federal liquor statutes construed alone. In the instant case those statutes must be interpreted in connection with the statute of March 2, 1917 (chapter 146).

[4] This Act of Congress of March 2, 1917, c. 146 (39 Stat. 969), was entitled: "An act making appropriations for the current and contingent expenses of the Bureau of Indian Affairs, for fulfilling treaty stipulations with various Indian tribes, and for

other purposes, for the fiscal year ending June thirtieth, nineteen hundred and eighteen."

It was provided in section 17 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 4137a): "That all of Osage county, Oklahoma, shall hereafter be deemed to be Indian country within the meaning of the acts of Congress making it unlawful to introduce intoxicating liquors into the Indian country."

It is earnestly contended by defendant that this provision of the Act of March 2, 1917, is invalid, as being beyond the power of Congress to enact, and as invading the sovereignty of the state of Oklahoma. This contention raises at once the vital questions in the case. It might be said in answer to this contention that the adoption of the Enabling Act by the Oklahoma constitutional convention with the provision heretofore quoted was sufficient to prevent that state from questioning the Act of March 2, 1917. See U. S. v. Sutton, 215 U. S. 291, 30 S. Ct. 116, 54 L. Ed. 200.

But we base answer to the above contention on broader ground, because, as was declared in Coyle v. Oklahoma, 221 U. S. 559, 570, 31 S. Ct. 688, 691 (55 L. Ed. 853): "Such stipulations * * * being within the sphere of congressional power, can derive no force from the consent of the State. * * * Whatever force such provisions have after the admission of the state may be attributed to the power of Congress over the subjects, derived from other provisions of the Constitution, rather than from any consent by or compact with the state."

We have seen that a contention similar to the one in the instant case was made in United States v. 43 Gallons of Whisky, supra. There is, it is true, this difference between that case and the one at bar. In that case the treaty made by the United States with the Indians simply continued the status of certain land as Indian country, so far as concerned the introduction and sale of intoxicating liquor, although the title of the Indians was extinguished by the same instrument; in the case at bar, the act of Congress, if valid, recreates the status of Indian country for similar purposes, upon lands in Osage county, Okl., which had theretofore lost that status. We think, however, the difference between the two situations is not vital.

[5] Under section 8, article 1, of the Constitution of the United States, the power to regulate commerce with the Indian tribes is vested in Congress. This power has been most liberally construed. It is a continuing power and cannot be abdicated. It covers

traffic or intercourse, not only with Indian tribes, but also with a member of such tribe, although within the limits of a state. U. S. v. Holliday, 3 Wall. 407, 417, 18 L. Ed. 182; U. S. v. 43 Gallons of Whisky, supra; Dick v. U. S., supra; Ex parte Webb, 225 U. S. 663, 683, 32 S. Ct. 769, 56 L. Ed. 1248. In the Holliday Case the court said:

"Judge Marshall, in speaking of the power to regulate commerce with foreign states, says: 'The power does not stop at the jurisdictional limits of the several states. It would be a very useless power, if it could not pass those lines.' 'If Congress has power to regulate it, that power must be exercised wherever the subject exists.' It follows from these propositions, which seem to be incontrovertible, that if commerce, or traffic, or intercourse, is carried on with an Indian tribe, or with a member of such tribe, it is subject to be regulated by Congress, although within the limits of a state. The locality of the traffic can have nothing to do with the power. The right to exercise it in reference to any Indian tribe, or any person who is a member of such tribe, is absolute, without reference to the locality of the traffic, or the locality of the tribe, or of the member of the tribe with whom it is carried on. It is not, however, intended by these remarks to imply that this clause of the Constitution authorizes Congress to regulate any other commerce, originated and ended within the limits of a single state, than commerce with the Indian tribes."

[6] This power is not terminated by the mere facts that allotments of land have been made to the Indians and citizenship conferred upon them. Hallowell v. U. S., 221 U. S. 317, 31 S. Ct. 587, 55 L. Ed. 750; Tiger v. Western Inv. Co., 221 U. S. 286, 31 S. Ct. 578, 55 L. Ed. 738.

[7] In determining the validity of the exercise of such power the circumstances surrounding the exercise should be considered. At the time when the Act of March 2, 1917, was passed there were still allotments of land in Osage county to which the Indian title had not been extinguished. This is apparent from the provisions in section 17 of the act relative to the appraisal of such allotments.

It was conceded by counsel on the argument of the case at bar that there are still lands in Osage county to which the Indian title has not been extinguished, and that a considerable number of Indians are residents in said county, over whom the United States exercises more or less care and control. This situation is also apparent from the recent legislation of Congress. Act May 24, 1922, c. 199 (42 Stat. 552, 574); Act Jan. 24, 1923, c. 42 (42 Stat. 1174, 1195, 1196); Act Feb. 27, 1925 (43 Stat. 1008)—all providing for the expenditure of tribal funds held by the government in trust for the Osage Tribe. In fact, it appears from one of said acts that Osage tribal real estate still exists within the incorporated town of Pawhuska.

In view of these facts and circumstances, we reach the conclusion that the passage of the Act of March 2, 1917, was simply a readoption by Congress of the practice of defining "Indian country" as a means for efficiently exercising its care and control over tribal Indians, and that the act was valid. That Congress had full power over commerce with the tribal Indians still remaining in Osage county and in adjoining territory, including the power to prohibit the sale or gift to them of intoxicating liquor, or the possession of intoxicating liquor on land still remaining Indian country, is beyond question. In addition, Congress also had power under the last clause of section 8, article 1, of the Constitution of the United States: "To make all laws which shall be necessary and proper in carrying into execution the foregoing powers."

Doubtless, in the judgment of Congress, the prohibition of possession of intoxicating liquor in the whole of Osage county was necessary and proper, in order effectively to prevent traffic in such article with the Indians therein residing, and while under the care of the government. We cannot say that such conclusion by Congress was not justified by the situation. The oft-quoted words of Chief Justice Marshall are apposite: "Let the end be legitimate, let it be within the scope of the Constitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consist with the letter and spirit of the Constitution are constitutional." McCulloch v. Maryland, 4 Wheat. 316, 421 (4 L. Ed. 579).

The sovereignty of the state of Oklahoma is not invaded, nor is her position of equality with the other states infringed. The above-quoted remarks of the court in the case of U. S. v. 43 Gallons of Whisky, supra, in reference to the state of Minnesota, are strictly applicable to the case at bar. A somewhat analogous exercise of power by Congress was illustrated in the passage of the National Prohibition Act (Comp. St. Ann. Supp. 1923, § 10138¼ et seq.). The Eighteenth Amendment to the Constitution does not prohibit the possession of intoxicating liquor;

but, in order to make the enforcement of the Eighteenth Amendment effective as to manufacture, sale, and transportation, Congress in the passage of the National Prohibition Act included possession within the prohibition, and this has been held by the courts a proper exercise of congressional power, Massey v. U. S., 281 F. 293 (this court); Rose v. U. S. (C. C. A.) 274 F. 245, 248; Page·v. U. S. (C. C. A.) 278 F. 41, 44; Jordan v. U. S. (C. C. A.) 299 F. 298.

That a state, in order to efficiently enforce its liquor laws, may prohibit the possession of intoxicating liquor within its boundaries, without regard to the questions when or how or for what purpose such liquor was acquired, has been decided very recently by the Supreme Court in Samuels v. McCurdy (opinion March 2, 1925) 267 U. S. 188, 45 S. Ct. 264, 69 L. Ed. ——. It was held that such a law did not infringe upon the constitutional rights of a citizen possessing liquor. By parity of reasoning, since Congress has the. undoubted power to prohibit the furnishing of intoxicating liquor to Indians under government care and control, it may prohibit the possession of liquor by any one in places in proximity to the place of abode of such Indians—as a measure reasonably appropriate or needful to the effective exercise of its undoubted power. The Act of March 2, 1917, has such a purpose and such a scope.

Counsel for plaintiff in error asks the question in reference to such congressional power: "Where would be the limit?" The answer to such a question was given many years ago by Mr. Justice McLean in his concurring opinion in the case of Worcester v. Georgia, 6 Pet. 515, 593 (8 L. Ed. 483): "But the inquiry may be made, is there no end to the exercise of this power over Indians, within the limits of a state, by the general government? The answer is that, in its nature, it must be limited by circumstances." In our judgment the facts and circumstances disclosed in the case at bar clearly warranted the passage of the Act of March 2, 1917.

Similar restrictions have been enacted by Congress relative to private lands in proximity to districts under government control for the purpose of effectively carrying out powers vested in Congress: Act May 18, 1917, c. 15, § 12 (40 Stat. 82 [Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 2019a]), giving the President power to prohibit alcoholic liquors .in or near military camps. Section 13 of the same act (section 2019b) giving similar power as to bawdy houses. Resolution of September 12, 1918, c. 170 (40 Stat. 958), giving power to the President to es-tablish zones around coal mines and munition factories, etc., in which the sale, manufacture, and distribution of intoxicating liquors should be prohibited. Act Nov. 21, 1918, c. 212, § 1 (40 Stat. 1045, 1047 [Comp. St. Ann. Supp. 1919, § 3115¹¹/₁₂e]), giving similar power to the President to establish zones for similar purposes.

[8] The second assignment of error raises the question whether the statute under which plaintiff in error was prosecuted has been repealed by the National Prohibition Act. This question has been heretofore answered in the negative by this court, in the case of McClintic v. U. S., 283 F. 781, and later by the Supreme Court in Kennedy v. U. S., 265 U. S. 344, 44 S. Ct. 501, 68 L. Ed. 1045. The question is at rest.

[9] The third assignment of error raises the question of the sufficiency of the evidence to support the verdict, but this assignment is not available here, inasmuch as no motion for a directed verdict was made in the trial court. See Feinberg v. U. S., 2 F.(2d) 955 (this court), where the authorities are reviewed.

In our opinion, the judgment of the .court below should be affirmed; and it is so ordered.