# CLAIRMONT *v.* UNITED STATES.

ERROR TO THE DISTRICT COURT OF THE UNITED STATES
FOR THE DISTRICT OF MONTANA.

No. 239.   Submitted May 1, 1912.—Decided June 10, 1912.

The act of January 30, 1897, 29 Stat. 506, c. 109, in regard to sale of
liquor to the Indians and introduction of liquor into Indian country,
repealed, as far as inconsistent therewith, the Act of July 23, 1892,
27 Stat. 260, c. 234.

An indictment under the act of January 30, 1897 for introducing
liquor into Indian country cannot be sustained if the offense alleged
was committed on land within a State and which had been com-
pletely withdrawn from the reservation, and the Indian title thereto
surrendered so as not then to be Indian country.   Under such cir-
cumstances the District Court of the United States has no jurisdic-
tion.

Although that portion of the act of 1834 which defined Indian country
was repealed by § 5596 Rev. Stat., it may still be referred to in con-
nection with the portion of the act remaining in force in order to de-
termine what must be regarded as Indian country when spoken of in
the statutes.

A cession by Indians may be qualified by a stipulation in the treaty
that the ceded territory, although within the boundaries of a State,
shall retain its original status of Indian country so far as the intro-
duction therein of liquor is concerned.

The title to that part of the Flathead Reservation in Montana included
within the right of way of the Northern Pacific Railway Company,
has been completely withdrawn from the Reservation and the In-
dian title thereto extinguished and therefore is no longer Indian
country within the meaning of the act of January 30, 1897.

THE facts, which involve the construction of Federal
statutes relative to introduction of liquor to allottee
Indians and on allotments to Indians, are stated in the
opinion.

*Mr. N. W. McConnell* and *Mr. O. W. McConnell* for plaintiff in error.

*Mr. Assistant Attorney General Denison,* with whom *Mr. Louis G. Bissell,* Attorney, was on the brief, for the United States:

Beyond question the Indian land title in this strip had been entirely extinguished. 13 Stat. 365; *Northern Pacific R. R. Co.* v. *Townsend,* 190 U. S. 267; *Buttz* v. *Northern Pacific Railroad Co.,* 119 U. S. 355.

There is nowhere any express provision for the retention of any Federal police power over this strip, excepting that statements were made by the representative of the United States in the council with the Indians which preceded their deed to the effect that no liquor would be sold "on the reservation at the depots;" that after the road was built there would be "no white men to sell liquor," and that "the white people will not be allowed to go on the reservation."

This informal and parol agreement, and the fact that the grant was made for the limited purpose, and the physical situation of the strip in reference to the reservation and in its contact with the Indians brings this case under *Dick* v. *United States,* 208 U. S. 340.

In the Montana enabling act, 25 Stat. 677, the United States reserved its jurisdiction with reference to "unappropriated public lands."

In view of these conditions, the decisions of this court in *Maricopa Railroad Co.* v. *Arizona,* 156 U. S. 347, and *Bates* v. *Clark,* 95 U. S. 204, 208, 209, may perhaps finally dispose of the case; and see *Utah & Northern Ry.* v. *Fisher,* 116 U. S. 28, which seems to imply that the grant of a railroad right of way takes the land out of the reservation only in so far as may be necessary for the particular purposes of the grant.

The territorial power to tax the railroad line is not nec-

essarily inconsistent with the continuation of the Federal police power for purposes of the discharge of the duty toward the Indians. *United States* v. *43 Gallons of Whiskey*, 93 U. S. 188; 108 U. S. 491; *United States* v. *McBratney*, 104 U. S. 621; *Thomas* v. *Gay*, 169 U. S. 264, 277; *Draper* v. *United States*, 164 U. S. 240; *Truscott* v. *Hurlburt Land & Cattle Co.*, 73 Fed. Rep. 60.

The *locus in quo* was a part of a tract definitely set apart as a reservation for exclusive occupancy by the Indians, 12 Stat. 940. It, therefore, possessed its character as Indian country more because of the specific action by Congress than by reason of the original general definition of Indian country. 4 Stat. 729.

As to *United States* v. *4 Bottles Sour Mash Whiskey*, 90 Fed. Rep. 720, see 22 Ops. Atty. Genl. 232.

MR. JUSTICE HUGHES delivered the opinion of the court.

The plaintiff in error was indicted by the grand jury of the United States for the District of Montana for introducing intoxicating liquor into the Flathead Indian Reservation. It appeared upon the trial in the District Court that he lived on the reservation and at the time of the alleged offense was returning to his home from Missoula on a train of the Northern Pacific Railway Company, intending to leave the train at Ravalli. A special officer of the Interior Department boarded the train at Arlee, and, finding a pint of whisky on the person of the plaintiff in error, at once arrested him and took him back to Missoula. Both Arlee and Ravalli are points within the exterior limits of the reservation, which is crossed by the right of way of the railway company.

The jury rendered a verdict of guilty, whereupon it was urged by motion in arrest of judgment that the court was without jurisdiction. The motion was denied and the defendant was sentenced to imprisonment for sixty

days and to the payment of a fine of $100. The case comes here on writ of error, the District Judge certifying the question of jurisdiction. The conviction was had under the act of January 30, 1897, c. 109,[1] 29 Stat. 506, which provides:

"That any person who shall sell, give away, dispose of, exchange, or barter any malt, spirituous, or vinous liquor, including beer, ale, and wine, or any ardent or other intoxicating liquor of any kind whatsoever . . . to any Indian to whom allotment of land has been made while the title to the same shall be held in trust by the Government, or to any Indian a ward of the Government under charge of any Indian superintendent or agent, or any Indian, including mixed bloods, over whom the Government, through its departments, exercises guardianship, and any person who shall introduce or attempt to introduce any malt, spirituous, or vinous liquor, including beer, ale, and wine, or any ardent or intoxicating liquor of any kind whatsoever into the Indian country, which term shall include any Indian allotment while the title to the same shall be held in trust by the Government, or while the same shall remain inalienable by the allottee without the consent of the United States, shall be punished by imprisonment for not less than sixty days, and by a fine of not less than one hundred dollars for the first offense and not less than two hundred dollars for each offense thereafter: *Provided however*, That the person convicted shall be committed until fine and costs are paid."

We are not here concerned with that portion of the statute which penalizes selling or giving intoxicating liquors to the Indians described or with the authority of Congress to protect the Indian wards of the Nation.

---

[1] This repealed, so far as it was inconsistent, the act of July 23, 1892, c. 234, 27 Stat. 260, which amended § 2139 of the Revised Statutes.

The indictment charged that the plaintiff in error "did, then and there, wrongfully and unlawfully introduce" a quantity of intoxicating liquor "into the Flathead Indian Reservation, in the State and District of Montana," the said reservation "being an Indian country." The offense alleged was the introduction of the liquor into the reservation, and not "attempting to introduce."

The Flathead Indian Reservation was established by the treaty of July 16, 1855, between the United States and the confederated tribes of the Flathead, Kootenay and Upper Pend d'Oreilles Indians. 12 Stat. 975. It comprised a district now included within the boundaries of the State of Montana. The Enabling Act of 1889, under which the State was formed, required the adoption of an ordinance, irrevocable in the absence of the consent of the United States, providing: "That the people inhabiting" the proposed State "do agree and declare that they forever disclaim all right and title to the unappropriated public lands lying within the boundaries thereof, and to all lands lying within said limits owned or held by any Indian or Indian tribes; and that until the title thereto shall have been extinguished by the United States, the same shall be and remain subject to the disposition of the United States, and said Indian lands shall remain under the absolute jurisdiction and control of the Congress of the United States." Act of February 22, 1889, c. 180, 25 Stat. 676, 677.

By the act of July 2, 1864, c. 217, § 2, 13 Stat. 365, 367, Congress granted a right of way through the public lands to the Northern Pacific Railroad Company for the construction of a railroad and telegraph as proposed, "to the extent of two hundred feet in width on each side of said railroad," including all necessary ground for station buildings, workshops, etc. It was provided that the United States should "extinguish, as rapidly as may be consistent with public policy and the welfare of the said

Indians, the Indian titles to all lands falling under the oper-
ation of this act, and acquired in the donation to the road
named in this bill." On July 5, 1882, the railroad com-
pany filed a map of definite location showing its line of
railroad across the southwestern part of the Flathead
reservation. Thereupon on September 2, 1882, the con-
federated tribes above mentioned entered into an agree-
ment with the United States by which, after reciting
the grant by Congress of the right of way, the treaties
with the Indians, and the filing of the map of definite
location, the Indians surrendered and relinquished to
the United States "all the right, title and interest which
they now have under and by virtue of the aforesaid treaty
of July sixteenth, eighteen hundred and fifty-five, in
and to all that part of the Jocko (or Flathead) Reserva-
tion situate in the Territory of Montana and described
as follows, namely: A strip of land not exceeding two
hundred feet in width, that is to say, one hundred feet
on each side of the line laid down on the map of definite
location hereinbefore mentioned wherever said line runs
through said reservation." In consideration of the "sur-
render and relinquishment of lands as aforesaid," amount-
ing in the aggregate to 1430 acres, the United States
agreed to pay to the Indians the sum of $16,000. (Ex.
Doc. No. 15, 48th Cong. 1st sess.)

Thus, by the grant of Congress the railroad company
obtained the fee in the land constituting the "right of
way" (*Buttz v. Northern Pacific R. R. Co.*, 119 U. S. 55,
56, 66; *Northern Pacific Ry. Co.* v. *Townsend*, 190 U. S.
267, 271), and by virtue of the agreement between the
United States and the Indians this land was freed from
the Indian right of occupancy. As the Government
states in its brief: "Beyond question the Indian land
title in this strip had been entirely extinguished."

The question then is whether a person having intoxi-
cating liquor in his possession on a railroad train running

on this strip can be deemed to have introduced the liquor "into the Indian country" within the meaning of the act of 1897. Was the strip "Indian country" so that the District Court of the United States can be said to have had jurisdiction of the alleged offense?

The act of June 30, 1834, c. 161, 4 Stat. 729, thus defined "the Indian country":

"That all that part of the United States west of the Mississippi, and not within the states of Missouri and Louisiana, or the territory of Arkansas, and, also, that part of the United States east of the Mississippi river, and not within any state to which the Indian title has not been extinguished, for the purposes of this act, be taken and deemed to be the Indian country."

This portion of the act of 1834 was not reënacted in the Revised Statutes, though other parts of the statute were, and hence was repealed by § 5596 of the revision. But, as has frequently been stated by this court, the definition may still "be referred to in connection with the provisions of its original context which remain in force, and may be considered in connection with the changes which have taken place in our situation, with a view of determining from time to time what must be regarded as Indian country where it is spoken of in the statutes." *Ex parte Crow Dog*, 109 U. S. 556, 561; *United States* v. *LeBris*, 121 U. S. 278, 280.

The proper criterion to be applied was considered in *Bates* v. *Clark*, 95 U. S. 204, where Mr. Justice Miller, delivering the opinion of the court, said (*id.*, pp. 207, 208): "Notwithstanding the immense changes which have since taken place in the vast region covered by the act of 1834, by the extinguishment of Indian titles, the creation of States and the formation of territorial governments, Congress has not thought it necessary to make any new definition of Indian country. Yet during all this time a large body of laws has been in existence,

whose operation was confined to the Indian country, whatever that may be. . . .

"The simple criterion is that as to all the lands thus described it was Indian country whenever the Indian title had not been extinguished, and it continued to be Indian country so long as the Indians had title to it, and no longer. As soon as they parted with the title, it ceased to be Indian country, without any further act of Congress, unless by the treaty by which the Indians parted with their title, or by some act of Congress, a different rule was made applicable to the case."

It must be assumed that, in the act of 1897, Congress used the words "Indian country" in the accepted sense. And this is confirmed by the provision bearing witness to the policy which had been adopted looking to the dissolution of tribal relations and the distribution of tribal property in separate allotments. Thus, the act provides that the term Indian country "shall include any Indian allotment while the title to the same shall be held in trust by the Government, or while the same shall remain inalienable by the allottee without the consent of the United States." *United States* v. *Sutton*, 215 U. S. 291; *Hallowell* v. *United States*, 221 U. S. 317, 323, 324.

That the effect of a cession by the Indians might be qualified by a stipulation in the treaty that the ceded territory, although within the boundaries of a State, should retain its original status of Indian country so far as the introduction into it of intoxicating liquors was concerned was decided in *United States* v. *Forty-three Gallons of Whiskey*, &c., 93 U. S. 188; 108 U. S. 491. But, as was pointed out in *Bates* v. *Clark*, *supra*, that decision proceeded upon the hypothesis that "when the Indian title is extinguished it ceases to be Indian country, unless some such reservation takes it out of the rule." The same principle of decision was recognized in *Dick* v.

*United States*, 208 U. S. 340. There, the plaintiff in error had been convicted of introducing intoxicating liquor into the Nez Perce Indian Reservation within the State of Idaho. The offense was committed, if at all, in the village of Culdesac, which, although within the boundaries of the reservation as established before Idaho was admitted into the Union, was at the time specified in the indictment an organized village of that State. The lands upon which the village was located were part of those ceded to the United States by an agreement with the Indians in which it was stipulated that the ceded lands, as well as those retained, should be subject for the period of twenty-five years to all Federal laws prohibiting the introduction of intoxicants into the Indian country. It was held that this was a valid stipulation based upon the treaty-making power of the United States and upon the power of Congress to regulate commerce with the Indians, and was "not inconsistent, in any substantial sense, with the constitutional principle that a new State comes into the Union upon entire equality with the original States" (p. 359). Upon this ground the judgment of conviction was affirmed.

While the *Dick Case* was thus found, owing to the stipulation in the agreement, to be within the exception, the court explicitly recognized the rule which governs in the absence of a different provision by treaty or by act of Congress. The court said (p. 352): "If this case depended *alone* upon the Federal liquor statute forbidding the introduction of intoxicating drinks into the Indian country, we should feel obliged to adjudge that the trial court erred in not directing a verdict for the defendant; for that statute, when enacted, did not intend by the words 'Indian country' to embrace any body of territory in which, at the time, the Indian title had been extinguished, and over which and over the inhabitants of which (as was the case of Culdesac) the jurisdiction

of the State, for all purposes of government, was full and complete. *Bates* v. *Clark*, 95 U. S. 204; *Ex parte Crow Dog*, 109 U. S. 556, 561."

In the present case there was no provision, either in the treaty with the Indians, or by act of Congress, which limited the effect of the surrender of the Indian title. We have been referred to certain statements made by the representative of the United States in the course of the negotiations with the Indians which preceded their agreement, but these were of an informal character and cannot be regarded as qualifying the agreement that was actually made. The Indian title or right of occupation was extinguished, without reservation; and the relinquished strip came under the jurisdiction of the then Territory and later under that of the State of Montana. It was not "unappropriated public land," or land "owned or held by any Indian or Indian tribe." (Enabling Act, *supra.*)

To repeat, the plaintiff in error was not charged with "attempting to introduce" the liquor into Indian country, but with the actual introduction. If having the liquor in his possession on the train on this right of way did not constitute such introduction, it is immaterial so far as the charge is concerned whether or not he intended to take it elsewhere. Nor is it important that the plaintiff in error was an Indian. The statute makes it an offense for "any person" to introduce liquor into Indian country.

Our conclusion must be that the right of way had been completely withdrawn from the reservation by the surrender of the Indian title and that in accordance with the repeated rulings of this court it was not Indian country. The District Court therefore had no jurisdiction of the offense charged and the judgment must be reversed.

*The judgment is reversed and the cause remanded with directions to quash the indictment and discharge the defendant.*