STATE, Respondent, *v.* PEPION, et al., Appellants.
No. 9045.
Submitted March 9, 1951. Decided March 30, 1951.
230 Pac. (2d) 961.

Messrs. Doyle & Francisco, Conrad, for appellant.

Mr. Arnold H. Olsen, Atty. Gen., Mr. Glen E. Cox, Asst. Atty. Gen., Mr. Lloyd A. Murrills, County Attorney (Glacier), Cut Bank, for respondent.

Mr. Doyle, Mr. Cox and Mr. Murrills argued orally.

MR. JUSTICE BOTTOMLY:

In the state district court of Glacier county, Montana, the defendant Peter Tatsey was tried and convicted of the crime of grand larceny, charged to have been committed by him in Glacier county, by feloniously taking, stealing and carrying away money in excess of $50.00, the property of Leon Bliss. He was sentenced to serve a term of five years at hard labor in the state prison.

This appeal is from the judgment of conviction.

The evidence shows:

That Leon Bliss, starting from Big Sandy, Montana, the night of November 10th, where he had cashed a federal crop insurance check, having paid several bills, had somewhere around $160.00 when he left Big Sandy, going by way of Havre, Kremlin and Shelby, spending money at each place, arriving

in the town of Browning, Montana, at about four o'clock in the morning of November 11, 1949. Stopping first at Todd's Steakhouse in Browning, Bliss paid a bill; at that time, Bliss testified, he had somewhere between $130 and $160, consisting of $20.00 bills, fives or tens, and some change. Bliss had been drinking beer and whisky at Havre, Kremlin, Shelby and upon arrival in Browning was intoxicated, having whisky in his pick-up truck. At Todd's Steakhouse Bliss met one Mazie Chief All Over, an Indian married woman; together they went to Minnie Hall's place, in Browning, to get some more whisky; at Minnie Hall's place Bliss pulled out his money to buy drinks with; Bliss gave a $20.00 bill to defendant Peter Tatsey, an Indian, to buy more whisky; at that time Bliss was flashing his money around; he put it on the table, saying he didn't know how much money he had; Mazie Chief All Over picked up the money and counted it; Bliss and Mazie were intoxicated at the time; Mazie testified she counted $130.00 and handed it to Bliss. Bliss testified he put it in his front shirt pocket, but it wasn't counted by Bliss at that time, nor at any subsequent time. Mazie didn't know what Bliss did with the money.

Bliss, Mazie, Peter Tatsey and one Andrew Pepion, also an Indian, all left the Hall's place in a 1941 model one-seat Plymouth coupe, Tatsey driving, Pepion sitting in the middle, Bliss on the right side with Mazie Chief All Over on his lap. All were intoxicated; they drove down in front of Todd's Steakhouse where Tatsey procured three or four pints of whisky with the money Bliss had given him for that purpose. They all proceeded to have more drinks; all then went to Peter Tatsey's house in Browning, where they had more drinks of whisky; by this time Bliss was making disparaging and insulting remarks about Indians and the Tatsey home. They then all got back in the Plymouth coupe seated as before; Bliss testified that he went along because he wanted to help drink the balance of the whisky that he paid for. Tatsey drove the car south of Browning on the Browning-Heart Butte road, approximately four or five miles south of the Great Northern depot; all of the

witnesses, Bliss, Mazie, Tatsey and Pepion being drunk. Tatsey drove the car off the road about 75 yards as he testified; Mazie thought they drove off the road a mile; Bliss thought they turned off three or four yards. There Tatsey stopped the car, got out and came around the car, jerking Bliss out and hit him in the face, knocking Bliss down and left him there.

The complaining witness Bliss testified: That when he came to some time later he had no money; that he did not know whether or not Tatsey or anybody took any money off of him out on the road. At the time the car was stopped, Bliss didn't know on what side of the road they had turned off; as a matter of fact Bliss was so drunk at that time as he testified, he didn't know what was happening or had happened except that he was struck. Bliss testified he knew it was against the law to buy whisky for Indians on an Indian reservation.

The foregoing recital is a part of the sordid, drunken carousal that the complaining witness, Bliss, was participating in and instigating. Bliss, whose skin is at least white was inducing and attempting to corrupt Mazie Chief All Over, Pepion, and Tatsey, the latter being a ward of the Federal Government.

The town of Browning is the principal trade center for the Blackfeet Indian reservation where is located the Indian hospital, the Indian museum, and the Indian agency; the foregoing as well as the road running southerly from Browning, past the Great Northern Railway's depot, which serves Browning, and thence on south to Heart Butte, and the entire country between the two points, are all within the exterior boundaries of the Blackfeet Indian reservation.

Both in the trial court and here Tatsey challenged the jurisdiction of the state district court to try him for the alleged offense. He also challenges the sufficiency of the evidence to sustain the judgment.

In our view of the case the question of jurisdiction is determinative of the appeal.

The evidence shows:

That the defendant Peter Tatsey is an Indian; a ward of

the United States Government, the state having so stipulated; that he was born on the Blackfeet Indian reservation; that he lives on said reservation; that his father, John Tatsey, is a member of the Indian tribe at Browning; that his mother, Belle Tatsey, is a Sioux Indian; that defendant has an Indian allotment on the Fort Peck Indian reservation and that no fee patent has been issued to him. The witness Lars Boe, a deputy county assessor of Glacier county, testified that all of the land on the Heart Butte-Browning Road was within the Blackfeet Indian reservation; his testimony was corroborated by the testimony of the witness Stanley R. Pugh, lease clerk for the Blackfeet Indian reservation, who testified further, that the Blackfeet Indian reservation extends south of the Great Northern depot which serves the town of Browning, to Birch Creek, the southerly boundary of said reservation. Such boundary is approximately 32 miles south of Browning. The testimony of the state's witness William Show, Jr., corroborates much of the foregoing evidence.

Thus it appears affirmatively that the offense, if any, of which Peter Tatsey, an Indian, was charged, convicted and sentenced, was committed, if at all, within the confines and limits of the Blackfeet Indian reservation, and therefore within "Indian country," as defined by section 1151, Title 18 U. S. C. A., as amended May 24, 1949, C. 139, sec. 25, 63 Stat. 94, which defines Indian country as follows: "Except as otherwise provided in sections 1154 and 1156 of this title, the term 'Indian country', as used in this chapter, means (a) all land within the limits of any Indian reservation under the jurisdiction of the United States government, notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation, (b) all dependent Indian communities within the borders of the United States whether within the original or subsequently acquired territory thereof, and whether within or without the limits of a state, and (c) all Indian allotments, the Indian titles to which have not been extinguished, including rights-of-way running through the same."

By section 1153, Title 18 U. S. C. A., it is provided that: *"Any Indian* who commits against the person or property of another Indian or *other person* any of the following offenses, namely, murder, manslaughter, rape, incest, assault with intent to kill, assault with a dangerous weapon, arson, burglary, robbery, and *larceny* within the Indian country, *shall be* subject to the same laws and penalties as all other persons *committing any* of the *above offenses,* within the *exclusive jurisdiction of the United States."* As amended May 24, 1949, C. 139, sec. 26, 63 Stat. 94. Emphasis supplied.

The jurisdiction and venue is established by section 3242, Title 18 U. S. C. A., as follows: *"All Indians committing* any of the following offenses, namely, murder, manslaughter, rape, incest, assault with intent to kill, assault with a dangerous weapon, arson, burglary, robbery, and *larceny* on and *within the Indian country shall be tried in* the same *courts,* and in the same manner, as all other persons committing any of the above crimes within the *exclusive jurisdiction of the United States."* As amended, May 24, 1949, C. 139, sec. 51, 63 Stat. 96. Emphasis supplied.

One of the main reasons for the federal government retaining its guardianship and its protection over its Indian wards was because of such occurrences as portrayed here. The policy of the federal government and the reasons therefor are ably stated by the Supreme Court of the United States in United States v. Kagama, 118 U. S. 375, 6 S. Ct. 1109, 1114, 30 L. Ed. 228, wherein the court said: "Because of the local ill feeling, the people of the states where they are found are often their deadliest enemies. From their very weakness and helplessness, so largely due to the course of dealing of the federal government with them, and the treaties in which it has been promised, there arises the duty of protection, and with it the power. This has always been recognized by the executive, and by congress, and by this court, whenever the question has arisen. * * *

"The power of the general government over these remnants of a race once powerful, now weak and diminished in numbers,

is necessary to their protection, as well as to the safety of those among whom they dwell. It must exist in that government, because it never has existed anywhere else; because the theater of its exercise is within the geographical limits of the United States; because it has never been denied; and because it alone can enforce its laws on all the tribes." Referring further to section 9 of the Act of March, 1885, now sec. 1153, Title 18 U. S. C. A., supra, the court said: "* * * congress has defined a crime committed within the state, and made it punishable in the courts of the United States. But congress *has* done this, and *can* do it, with regard to all offenses relating to matters to which the federal authority extends. * * * Its effect is confined to the acts of an Indian of some tribe, of a criminal character, committed within the limits of the reservation."

In United States v. Celestine, 215 U. S. 278, 284, 30 S. Ct. 93, 54 L. Ed. 195, the court speaking of section 1153, Title 18 U. S. C. A., said, inter alia, by this section Indians committing against other Indians or other persons on a reservation in a state any of the crimes named are subject to federal laws and tried in federal courts. See United States v. Chavez, 290 U. S. 357, 54 S. Ct. 217, 78 L. Ed. 360; United States v. Nice, 241 U. S. 591, 36 S. Ct. 696, 60 L. Ed. 1192; Donnelly v. United States, 228 U. S. 243, 269, 33 S. Ct. 449, 57 L. Ed. 820, Ann. Cas. 1913E, 710; State v. Rufus, 205 Wis. 317, 237 N. W. 67; Ex parte Pero, 7 Cir., 99 F. (2d) 28; State v. Campbell, 53 Minn. 354, 55 N. W. 553, 21 L. R. A. 169; State v. Phelps, 93 Mont. 277, 19 Pac. (2d) 319; 42 C. J. S., Indians, sec. 70, pages 775, 776; 27 Am. Jur., Indians, sec. 45, p. 570.

The evidence and the facts herein subject the defendant Indian to the applicable federal laws, and place him under the exclusive jurisdiction of the United States courts.

It should be pointed out that in order to clarify the different congressional Acts relating to Indians and to remove any doubt as to the federal jurisdiction over "Indian country" and the Indian wards residing therein, the Congress, after extensive hearings and as a result of the reports of the Judicial Con-

ference Committee, enacted the above quoted amendments.

It should be borne in mind that the above quoted federal statutes pertain to and are special legislative Acts applicable to Indians, and the commission of the enumerated offenses by Indians on and within ''Indian country.''

On the evidence and facts herein, the applicable federal ▮ statutes, the decisions of this court, and of the federal courts, we hold that the state district court was without jurisdiction and that its purported judgment herein is a nullity.

The purported judgment is vacated and the cause remanded with directions to dismiss the information.

MR. CHIEF JUSTICE ADAIR, and ASSOCIATE JUSTICES METCALF, ANGSTMAN and FREEBOURN, concur.

### On Petition for Rehearing

PER CURIAM.

The petition for rehearing in the above entitled cause is hereby denied.

MR. JUSTICE ANGSTMAN: (dissenting).

Upon further study of this case I am of the view that the opinion as written is erroneous. It holds that all lands within the boundaries of the Indian reservation are ''Indian country'' within sections 1151, 1153 and 3242, Title 18 U. S. C. A., even though the Indian title may have been extinguished.

In treating of such lands, section 4, part Second of the Enabling Act provides: ''* * * and that until the title thereto shall have been extinguished by the United States, the same shall be and remain subject to the disposition of the United States, and said Indian lands shall remain under the absolute jurisdiction and control of the congress of the United States''.

It has long been the rule that after the Indian title is extinguished jurisdiction of the United States over the land ceases. United States v. Forty-Three Gallons of Whisky, 93 U. S. 188, 23 L. Ed. 846; Bates v. Clark, 95 U. S. 204, 24 L. Ed. 471; Ex Parte Crow Dog, 109 U. S. 556, 3 S. Ct. 396, 27 L. Ed.

20

1030; Clairmont v. United States, 225 U. S. 551, 56 L. Ed. 1201, 32 S. Ct. 787; Dick v. United States, 208 U. S. 340, 28 S. Ct. 399, 52 L. Ed. 520.

The United States having lost jurisdiction over such lands cannot regain it by amending the statute defining ''Indian country'' if such were its purpose in enacting section 1151, supra, particularly as to lands over which the Indian title had been extinguished prior to such amendment. The only way in which the Federal Government could be reinvested with jurisdiction would be by Act of the state, as illustrated by the case of Kills Plenty v. United States, 8 Cir., 133 F. (2d) 292.

I think the opinion should be rewritten accordingly or that the motion for rehearing should be granted. Whether any of the other points raised by appellant are meritorious, I express no opinion, since they are not treated in the majority opinion.

Rehearing denied March 30, 1951.