STATE ex rel. IRVINE, Relator, *v.* DISTRICT COURT OF FOURTH JUDICIAL DIST. in and for LAKE COUNTY, ET AL., Respondents.

No. 9139.

Submitted November 16, 1951. Decided December 20, 1951.

239 Pac. (2d) 272.

400

Mr. Stanley M. Doyle, Polson, for relator.

Mr. Arnold H. Olsen, Atty. Gen., Mr. Glen E. Cox, Asst. Atty. Gen., Mr. John D. French, County Attorney, Polson, for respondents.

Mr. Doyle, Mr. French and Mr. Cox argued orally.

MR. JUSTICE BOTTOMLY:

Original proceeding. By information filed September 12, 1950, in the state district court of Lake county, Montana, the relator, James Hugh Irvine, an Indian ward of the federal government, was charged with the crime of burglary of a grocery store located in the city of Ronan, in Lake county, Montana.

On the day the information was filed the relator was arraigned without the benefit of counsel, waived the statutory time to plead, and entered a plea of guilty.

On September 19, 1950, the state district court sentenced relator to ten year's imprisonment in the state prison where, on the following day, he was delivered and where he has since been confined serving the sentence so imposed.

On July 13, 1951, the relator, *in forma pauperis* and *in propria persona* petitioned this court for relief, asserting that the state district court was wholly lacking in jurisdiction to enter the judgment of conviction and seeking to have such judgment and sentence vacated on the grounds that the relator is an Indian; that the store which he was charged to have burglarized is situate within the Flathead Indian reservation in Montana; that by reason thereof the state court was and is wholly lacking in jurisdiction to try or sentence him for the offense charged and contending that the exclusive jurisdiction of such crime when committed by an Indian in Indian Country is in the United States government.

On July 18, 1951, this court, after considering relator's petition ordered the proceeding transferred to the state district court wherein the information was filed and the judgment of conviction entered. See State ex rel. Irvine v. District Court of, etc., Lake County, Mont., 235 Pac. (2d) 662.

Following the transfer a hearing was had on August 7, 1951, before the district court on relator's petition. It was and is conceded by both the relator and the state that relator is an enrolled and allotted Indian and a member of the Flathead

Indian tribe; that the city of Ronan, in Lake county, Montana, and the store which relator is accused of having burglarized are within the exterior boundaries of the Flathead Indian reservation and that by appropriate instrument the United States government has ceded all right, title and interest in and to the property upon which the store building described in the information stands.

The only question there and here presented is one of jurisdiction.

October 11, 1951, the district court rendered an opinion and made an order disallowing relator's petition and denying him all relief. Timely written exceptions were served and filed. Thereafter, on October 23, 1951, on motion of the county attorney the trial court ordered relator's petition dismissed.

November 2, 1951, relator instituted the instant proceeding in this court seeking a writ against the respondent district court and on November 7, 1951, the writ issued returnable on a day certain on which day the matter was heard, argued and submitted.

The state contends that the state district court had jurisdiction of the offense and to impose the judgment rendered for the reason that the fee to the particular piece of land on which the alleged offense was committed had been alienated by the United States government although being within the limits of the Flathead Indian reservation.

Relator contends that the state courts are without jurisdiction of this offense, towit burglary, alleged to have been committed by this enrolled member of the Flathead Indian tribe who had been allotted lands therein, within the limits of the Flathead Indian reservation which Indian and his allotment is under the exclusive jurisdiction of the United States and with its Indian superintendent in charge of and supervising the Indian and the Indian affairs of and on said reservation; that the land on which the alleged offense was committed was conceded to be within the exterior boundaries of the Flathead Indian reservation.

Since the question of jurisdiction of the state trial court involves human liberties, as well as an asserted conflict between state and federal jurisdiction over crimes committed by such an Indian within the limits of a legally constituted, supervised, Indian reservation which lies within this state, we deem it appropriate to re-examine this question.

The question of jurisdiction should be inquired into by the ▆ court at the earliest inception on its own initiative to ascertain whether that particular court has jurisdiction of that class of offense. In re Coy, 127 U. S. 731, 758, 8 S. Ct. 1263, 32 L. Ed. 274; Barnes v. Hunter, 10 Cir., 188 F. (2d) 86, 89; Tooisgah v. United States, 10 Cir., 186 F. (2d) 93, 96.

It should be kept in mind that all congressional legislation ▆ relative to Indians and Indian affairs has been initiated and enacted for the benefit of the Indian. As was stated by the supreme court, "According to a familiar rule, legislation affecting the Indians is to be construed in their interest, and a purpose to make a radical departure is not lightly to be inferred." United States v. Nice, 241 U. S. 591, 599, 600, 36 S. Ct. 696, 698, 60 L. Ed. 1192.

"The policy of leaving Indians free from state jurisdiction ▆ and control is deeply rooted in the Nation's history." Rice v. Olson, 324 U. S. 786, 65 S. Ct. 989, 991, 89 L. Ed. 1367. Historically and consistently the federal government has always defined the legal status of the Indian and the relation which has existed between the government and the Indian as that of "guardian and ward" or "wards of the nation". United States v. Thomas, 151 U. S. 577, 14 S. Ct. 426, 429, 38 L. Ed. 276; State of Oregon v. Hitchcock, 202 U. S. 60, 26 S. Ct. 568, 50 L. Ed. 935; Ex parte Webb, 225 U. S. 663, 32 S. Ct. 769, 56 L. Ed. 1248; La Motte v. United States, 254 U. S. 570, 41 S. Ct. 204, 65 L. Ed. 410; United States v. Candelaria, 271 U. S. 432, 46 S. Ct. 561, 70 L. Ed. 1023; British-American Oil Producing Co. v. Board of Equalization, 299 U. S. 159, 57 S. Ct. 132, 81 L. Ed. 95.

It should be noted that the Flathead Indian reservation was

created by Hell Gate Treaty of 1855, 12 Stat. 975, between the Indian tribes called the Flathead Nation, and the federal government, and that the treaty with the Indians was not a grant of rights to the Indians but a grant of rights from the Indians with a reservation remaining to them. It is understood that the Flathead Indian reservation has been set apart by and under the superintendence of the federal government.

Also it should be kept in mind that we are dealing here as in ▮ the reported case of State v. Pepion, Mont., 230 Pac. (2d) 961, with the Acts of Congress known as the "Ten Major Crimes Act." These ten major crimes are enumerated in Title 18, secs. 1153 and 3242, U. S. C. A., and it also is noted that we are dealing only with offenses included therein which are committed by an Indian, a ward of the nation, enrolled in a tribe, the offense being charged as committed within the limits of an organized, government-supervised Indian reservation. The effect of these laws is confined to such offenses committed by an Indian within the limits of such a reservation. Exclusive jurisdiction over the Indian for this purpose has always been claimed and asserted by the general government, on the ground that the Indian is a ward thereof, and dependent thereon, and until fully emancipated and discharged from that condition, Title 25, sec. 349, U. S. C. A., the federal government continues to assert its exclusive jurisdiction to punish its ward for the committing of the enumerated offenses.

It seems to us that the attorney general and the court below ▮ have placed too much emphasis on the ownership of land, and have not given due weight to the fact that the jurisdiction of the federal government over the Indian and tribes rests, not upon the ownership of and sovereignty of certain tracts of land, but upon the fact that, as wards of the general government, they are the subjects of federal authority within the state when the mentioned offense is committed as herein stipulated. See Rice v. Olson, supra, 324 U. S. 786, at pages 790, 791, 65 S. Ct. 989.

"When we speak of the right to govern certain lands, we not

only mean the right to do some thing with the land itself, but to legislate for and control the people upon said lands * * *. When we say congress has the right to legislate for a place within its exclusive jurisdiction, *we mean for the people who are there,* as well as concerning the land itself.'' Emphasis supplied. United States v. Partello, C. C., 48 F. 670, 676; United States v. Kagama, 118 U. S. 375, 6 S. Ct. 1109, 30 L. Ed., 228; State v. Rufus, 205 Wis. 317, 237 N. W. 67; State v. Campbell, 53 Minn. 354, 55 N. W. 553, 21 L. R. A. 169; State v. Columbia George, 39 Or. 127, 65 Pac. 604.

In United States v. Thomas, supra, the defendant, an Indian of the Chippewa tribe, was indicted, tried and convicted of murder in the federal district court—the offense was committed on section 16, a school section ceded to the state under its Enabling Act, embraced within the reservation. Defendant's counsel moved to set aside the verdict contending that under the Enabling Act Wisconsin was ceded said section for school purposes and therefore it was not a part of the reservation and for that reason the state courts had jurisdiction to punish the alleged offense.

The court stated, 151 U. S. 577, at page 585, 14 S. Ct. 426, at page 429: ''But, independently of any question of title, we think the court below had jurisdiction of the case. The Indians of the country are considered as the wards of the nation, and whenever the United States set apart any land of their own as an Indian reservation, whether within a state or territory, they have full authority to pass such laws and authorize such measures as may be necessary to give to these people full protection in their persons and property, and to punish all offenses committed * * * by them within such reservations.'' Citing United States v. Kagama, supra. Compare Rice v. Olson, supra; Tulee v. Washington, 315 U. S. 681, 62 S. Ct. 862, 86 L. Ed. 1115.

Consideration has been given to the state's argument in regard to our Enabling Act and the provisions thereof. The answer to that argument is: That the admission of a state into the union, even without an express reservation by Congress

of governmental jurisdiction over the public lands within its borders, does not qualify the former federal jurisdiction over tribal Indians so as to withdraw from the United States authority to punish crimes committed by Indians on an Indian reservation, Donnelly v. United States, 228 U. S. 243, 33 S. Ct. 449, 57 L. Ed. 820, Ann. Cas. 1913E, 710; Id., 228 U. S. 708, 33 S. Ct. 1024, 57 L. Ed. 1035, or so as to make tribal Indians amenable to state laws for the ten major crimes committed on their reservation. 27 Am. Jur., Indians, pp. 568, 569, 572, secs. 43, 47; 42 C. J. S., Indians, sec. 70, pages 776, 777, sec. 79, subd. (b), pages 795, 796, 797. Whatever rights a state acquires by its Enabling Act are subordinate to the Indians' prior right of occupancy. United States v. Thomas, supra; Tulee v. Washington, supra.

The fact that the federal government has alienated its fee ▇ in land or lands, by patent, which are situate within the limits of a regularly organized Indian reservation in the state does not divest it of its exclusive jurisdiction over its ward Indian, who has committed, within the limits of such an Indian reservation, one of the ten major crimes, and such Indian committing such a crime is accountable only to it for the offense.

Clearly such a tribal Indian without an allotment has an equal immunity. See Ex parte Pero and Moore, 7 Cir., 99 F. (2d) 28, certiorari denied, Lee v. Pero, 306 U. S. 643, 59 S. Ct. 581, 83 L. Ed. 1043.

In United States v. McGowan, 302 U. S. 535, 538, 539, 58 S. Ct. 286, 288, 82 L. Ed. 410, the court stated: ''Congress possesses the broad power of legislating for the protection of the Indians wherever they may be within the territory of the United States'' and ''Congress alone has the right to determine the manner in which this country's guardianship over the Indians shall be carried out * * *.'' Compare State v. Jackson, 218 Minn. 429, 16 N. W. (2d) 752.

The federal government has always had the jurisdiction to ▇ enforce its criminal statutes within the limits of an Indian reservation to the exclusion of the state, as to the Indian com-

mitting such offense. It exercises its jurisdiction wherever therein the crime is committed. See Application of Konaha, 7 Cir., 131 F. (2d) 737, 739; United States v. Kagama, supra.

Neither the Constitution of the state, nor any Act of its legislature can withdraw such Indians from the Act of Congress which body alone has the constitutional right to legislate concerning its wards. Any other doctrine would make the legislation of the state the supreme law of the land, instead of the Constitution of the United States, and the laws and treaties made in pursuance thereof. Art. VI, U. S. Const. Compare United States v. Holliday, 3 Wall. 407, 18 L. Ed. 182; Worcester v. State of Georgia, 6 Pet. 515, 8 L. Ed. 483.

In Ex parte Pero and Moore, supra, Pero was an enrolled and allotted Indian, Moore was found to be an Indian, not enrolled and with no allotment. They were convicted of murder in the Wisconsin state court in 1927, and sentenced to life imprisonment in the Wisconsin state prison. The alleged crime was committed within the limits of the Bad River Indian reservation. The reservation had been by treaty with the federal government set aside for the Lake Superior Chippewa Indians. The contention of the Indians on application to the United States district court on writ of habeas corpus in 1938 was that jurisdiction to try them for the alleged crime was exclusively with the proper federal court, that the trial in the state court and its judgment rendered were a nullity and that petitioners were being unlawfully held in prison. The United States district court granted the writ and the state appealed. The circuit court stated, "Congress has enacted that '*All Indians* committing against the person or property of another Indian or other person any of the following crimes, namely, murder * * * on and within any *Indian reservation under the jurisdiction of the United States Government* * * shall be subject to the same laws, tried in the same courts, and in the same manner, and be subject to the same penalties as are all other persons committing any of the above crimes within the exclusive jurisdiction of the United States.' [Title 18, sec. 548, U. S. C. A.]" [99 F. (2d) 29.]

The court found that Moore was "an Indian within the protection of the federal guardian-ward relationship and within the meaning of *'Indian' as used in the jurisdictional statute in question * * *''* and "In view of the foregoing we conclude that petitioner Moore is an Indian within the meaning of Section 548, supra. And it follows * * * under the law of the United States, that the Circuit Court of Ashland County, Wisconsin, was without· jurisdiction to hear and pronounce judgment in the cause of State of Wisconsin v. Paul Moore, and that petitioner is being unlawfully detained in the Wisconsin State Prison * * *.

"We conclude that the District Court did not err in holding that petitioners Moore and Pero are under the exclusive jurisdiction of the United States and that jurisdiction over them in connection with the alleged offense was exclusively in the Federal District Court." Emphasis supplied. This case was taken to the United States Supreme Court by the attorney general of Wisconsin for writ of certiorari which was denied. See 306 U. S. 643, 59 S. Ct. 581, 83 L. Ed. 1043. It should be noted that this case of Ex parte Pero and Moore was rendered some five years after the decision of State v. Johnson, 212 Wis. 301, 249 N. W. 284. Compare Yohyowan v. Luce, D. C., 291 F. 425, 427, 429.

In application of Konaha, supra, Konaha was an enrolled member of the Menominee Tribe of Indians, residing on said reservation. The crime of manslaughter was alleged to have been committed by him on state highway No. 47, located within the boundary of said Indian reservation.

The federal district court on habeas corpus, held that the state of Wisconsin had no jurisdiction over this Indian and the state appealed. The circuit court stated [131 F. (2d) 738] : "It seems to be well settled that in the absence of legislation by Congress conferring jurisdiction upon the Wisconsin state courts, they have no jurisdiction of crimes committed by tribal Indians, on Indian reservations." State v. Rufus, supra; United States v. Kagama, supra. The court continued : "For our purpose, how-

ever it is immaterial whether he be referred to as 'a ward of the nation' or as one especially protected because of * * * Congressional action. In any case, the United States has consistently exercised exclusive jurisdiction over Indians who live on the reservations and are members of the tribe with which the United States has a treaty * * *.

"Our final conclusion, therefore, is that for the offense with which the appellee is charged, the Federal Court has exclusive jurisdiction." Compare Yohyowan v. Luce, supra.

We should keep in mind that we are here dealing with federal ▮▮▮▮ laws, enacted by Congress in the interests and protection of the "nation's wards." "The authority of the United States Government is supreme in its cognizance of all subjects which the Constitution has committed to it. Consequently, there can be no conflict of authority, in the sense here given to the term, between a state and a law of the United States in respect of such a matter, the former being always subordinate and the latter paramount. * * * The states * * * cannot invade a field which belongs exclusively to Congress. Likewise, where Congress has legislated upon a subject which is within its constitutional control and over which it has the right to assume exclusive jurisdiction and has manifested its intention to deal therewith in full, the authority of the states is necessarily excluded. * * *" 11 Am. Jur., Conflict of Laws, p. 306, sec. 8.

The Constitution of the United States, Article VI, denominated the paramount clause, provides in part: "This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and *the Judges in every State shall be bound thereby,* any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." Emphasis supplied. Compare Ex parte Anderson, 125 Mont. 331, 238 Pac. (2d) 910.

It should be emphasized that the above clause, "and the ▮▮▮▮ Judges in every State shall be bound thereby" is the

reason that every judge in every state is required to take the oath of office that is prescribed by the last paragraph of said Article. This clause contemplates that cases within the judicial cognizance of the United States, not only might, but would arise in the state courts, in the ordinary procedures. The obligation of the clause "is imperative upon the state judges in their official * * * capacities." They are not to decide merely according to state laws or Constitution, but according to the Constitution, laws and treaties of the United States—"the supreme law of the land." Compare Martin v. Hunter's Lessee, 1 Wheat. 304, 340, 4 L. Ed. 97; 21 C. J. S., Courts, sec. 206, n. 49, pages 365, 372.

It should be repeated that the Constitution, laws and treaties ▉▉▉ of the United States are as much a part of the law of every state as its own Constitution and laws. Compare Hauenstein v. Lynham, 100 U. S. 483, 490, 25 L. Ed. 628. A state law, even if based on the acknowledged police power of a state, must always yield in case of a conflict with the exercise by the General Government of any power it possesses under the laws and Constitution or with any right which that instrument gives or secures. See Jacobson v. Massachusetts, 197 U. S. 11, 25, 25 S. Ct. 358, 49 L. Ed. 643. As to the constitutionality of the federal legislation applicable herein, see United States v. Kagama, supra.

The General Government has consistently maintained that it has exclusive jurisdiction in dealing with its ward Indians, as was pointed out in State v. Pepion, supra. Section 1153, Title 18, U. S. C. A., provides: "*Any Indian* who commits against the person or property of another Indian or other person any of the following offenses, namely * * * burglary * * * within the Indian country, *shall be* subject to the same laws and penalties as all other persons committing any of the above offenses, within the *exclusive jurisdiction of the United States.*" Emphasis supplied.

The jurisdiction and venue of such crimes is established by ▉▉▉ Section 3242, Title 18, U. S. C. A., as follows: "*All Indians committing* any of the following offenses, namely * * *

burglary * * * on and within the Indian country, *shall be tried in the same courts* and in the same manner, *as are all other persons committing any of the above crimes within the exclusive jurisdiction of the United States.*" Emphasis supplied. The assuming of jurisdiction in such cases by the state district court conflicts with the action of Congress which has dealt with the crime of burglary committed by an Indian within the limits of an Indian reservation.

A great deal of argument has been developed in regard to the proper interpretation of the definition of "Indian Country," as defined by section 1151, Title 18, U. S. C. A., which reads as far as pertinent here, as follows, "the term 'Indian country', as used in this chapter, means (a) *all land within the limits of any Indian reservation under the jurisdiction of the United States government, notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation* * * *." Emphasis supplied.

A brief review of congressional legislation in recent years may be helpful. The Congress by its Criminal Code of 1909, Chapter 321, sec. 328, 35 Stat. 1151, sec. 548, Title 18, U. S. C. A., enacted, as far as pertinent here, that "All Indians committing against the person or property of another Indian or other person any of the following crimes, namely—murder, manslaughter, rape, assault with intent to kill, assault with a dangerous weapon, arson, burglary, and larceny, within any Territory of the United States, and either *within* or *without* an *Indian reservation,* shall be subject therefor to the laws of *such Territory* relating to said crimes, and shall be tried therefor in the same courts and in the same manner and shall be subject to the same penalties as are all other persons charged with the commission of said crimes, respectively; * *. And all such Indians committing any of the above-named crimes against the person or property of another Indian or other person within the boundaries of *any State* of the United States, and within the limits of any Indian reservation, shall be subject to the same laws, tried in the same courts and in the same manner, and be subject to the same penalties

.as are all other persons committing any of the above crimes within the exclusive jurisdiction of the United States''. Emphasis supplied.

By the Act of June 28, 1932, being Chapter 284, 47 Stat. 337, the Congress amended the above sections 548 and 549, Title 18, U. S. C. A., as far as pertinent here as follows: ''All Indians committing against the person or property of another Indian or other person any of the following crimes, namely, murder, manslaughter, rape, *incest,* assault with intent to kill, assault with a dangerous weapon, arson, burglary, *robbery,* and larceny on and within any Indian reservation *under the jurisdiction of the United States Government, including rights of way running through the reservation,* shall be subject to the same laws, tried in the same courts, and in the same manner, and be subject to the same penalties as are all other persons committing any of the above crimes within the exclusive jurisdiction of the United States * * *.'' Emphasis supplied.

It will be noted that the offenses of incest and robbery were added, making the ''Ten Major Crimes Act.'' Also added was the wording ''under the jurisdiction of the United States Government, including rights of way running through the reservation''.

The report of the Committee of the Judiciary, #304, on revision of Title 18 of the United States Code, 80th Congress, 1st Session, at p. A91, states in regard to section 1151 revised, ''This section consolidates numerous conflicting and inconsistent provisions of law into a concise statement of the applicable law.'' And in regard to section 1153 the report states at page A92: ''The revised section therefore suffices to cover prosecutions of the specific offenses committed on all reservations *as intended by Congress''* and ''Words 'Indian country' were substituted for language relating to *jurisdiction extending* to *reservations* and rights-of-way, in view of definite section 1151 of this title'' and ''Venue provisions of said section 548 of Title 18, U. S. C., 1940 ed. are incorporated in section 3242 of this title.'' Em-

phasis supplied. The foregoing manifests the intention of Congress in passing this legislation.

When this legislation is considered in conjunction with its historical background, we think the real intent of Congress in enacting the foregoing quoted part of section 1151, and defining "Indian Country," was to limit or restrict the meaning of "Indian Country" from the broad interpretation that had been given to the term by some of the federal courts in attempting to solve the questions that were arising in regard to those instances where parts of established Indian reservations had been ceded by the tribes to the government and then by the government thrown open to settlement. Also in some instances whole reservations had been completely disorganized, disestablished, dissolved and abandoned and all government supervision terminated.

To meet such situations the Congress by apt and deliberate choice of words and phrases defined "Indian Country" as "all land within the limits of any Indian reservation under the jurisdiction of the United States government, notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation", Title 18, sec. 1151, U. S. C. A., supra, demonstrating the intent of Congress to, in this paragraph restrict the exclusive jurisdiction of the United States to those Indian reservations which have been set apart and organized by and which are under the supervision of the General Government for and as Indian reservations lying within a state. Compare Tooisgah v. United States, supra.

Under the above quoted part of section 1151, supra, all land within the limits of any organized and supervised Indian reservation notwithstanding the issuance of any patent and including rights-of-way running through the reservation, upon which one of the offenses enumerated in section 1153 or 3242, supra, is committed by an Indian for the purpose of this Act is Indian Country, and the exclusive jurisdiction of such offenses so committed is in the federal courts. See State v. Pepion, supra.

As stated in Yohyowan v. Luce, supra, 291 F. 425, at page

429: "But in any event both this court and the Supreme Court of the state of Washington are bound by the decision of the Supreme Court of the United States; the question involved being one arising under the laws of the United States and capable of being determined by that court finally, whether the case giving rise to the question originates in a state or in a federal court." Compare Montana Manganese Co. v. Ringeling, 65 Mont. 249, 257, 211 Pac. 333.

*Relator's Attorney's Fees.* August 7, 1951, and prior to the commencement of the hearing that day held in the state district court on relator's petition after its transfer from this court, the relator in the custody of the sheriff of Lake county, appeared before the district court and, representing to the court that he was without counsel and wholly without the funds or means to employ counsel, requested that the court appoint Stanley M. Doyle, Esq. to represent him in the proceedings then about to commence. The county attorney objected to the proposed appointment contending that in such proceedings the district court was without authority to appoint counsel for relator.

The record before this court shows no ruling by the court on ▇▇▇▇ the county attorney's above objections nor does it show any written order appointing counsel to represent relator, but it does recite that a hearing on August 7, 1951, on relator's petition, was had before such court at which attorney Doyle represented the relator and that during the hearing and thereafter the court recognized Mr. Doyle as relator's counsel. The record disclosing that relator was wholly without funds or means to employ counsel, under the circumstances and the law, relator was entitled to counsel to represent and advise him, Art. III, secs. 6 and 16, Mont. Constitution; United States Constitution, Amend. 6; Sullivan v. Board of County Com'rs of Silver Bow County, Mont., 224 Pac. (2d) 135; Johnson v. Zerbst, 304 U. S. 458, 58 S. Ct. 1019, 82 L. Ed. 1461; Knox County Council v. State ex rel. Kirk, 217 Ind. 493, 29 N. E. (2d) 405, 130 A. L. R. 1427; John v. Municipal Court, 220 Wis. 334, 264 N. W. 829;

Rice v. Olson, supra; and we assume that such appointment was made.

October 17, 1951, relator's attorney Mr. Doyle, filed petition in the trial court for an allowance of attorney's fees which petition was resisted by the county attorney, and on October 23, 1950, the matter was submitted and taken under advisement. The question had not been determined ten days later, when relator through his counsel Mr. Doyle, instituted the instant proceeding in this court, hence the busy trial judge, with his many pressing duties, apparently did not have time to examine and determine the question as undoubtedly he will, in conformity with R. C. M. 1947, section 94-6513, as amended by Chapter 38, Laws of 1949.

We hold that the state district court was without jurisdiction to try the petitioning Indian for the offense of which he was here accused and for which he was convicted and that under the undisputed facts, the trial court's purported judgment is a nullity. Accordingly the judgment of conviction and the sentence imposed are reversed and set aside as void; the information is ordered dismissed; the petitioner James Hugh Irvine is ordered to be released and discharged from custody, and remittitur will issue forthwith.

MR. CHIEF JUSTICE ADAIR, and ASSOCIATE JUSTICES METCALF and FREEBOURN, concur.

MR. JUSTICE ANGSTMAN, (dissenting).

It is my view that the place where this crime was committed is no longer under the jurisdiction of the United States but is under the jurisdiction of the state of Montana and that the district court was right in so holding. Prior to the 1948 amendment of the federal statute, the rule was "that the country that was formerly subject to the Indian occupancy continued to be Indian country so long as the Indians had title to it, and no longer; as soon as the Indians parted with the title, it ceased to be Indian country without any further act of Congress."

27 Am. Jur., "Indians," p. 571, sec. 45. To the same effect is 42 C. J. S., "Indians," sec. 67, page 774.

Here the store that was burglarized by petitioner is a part of the town of Ronan; the Indian title to it is extinguished; the store is not operated for the benefit of the Indians and the federal government has no jurisdiction over it.

Since the majority opinion is based in part upon decisions from the state of Wisconsin prior to the amendment of 1948, it might be well to note what the rule of law is in that state.

In State v. Johnson, 212 Wis. 301, 249 N. W. 284, 287, the court, after reviewing many authorities, said: "We think the correct rule, supported by sound reason and the weight of authority, is that the state courts have jurisdiction to try Indians for offenses committed upon fully patented lands even though such lands are located within the exterior boundaries of an Indian reservation; that when the lands are fully patented by the United States they cease to be territory of the United States and become subject to the jurisdiction of the state and its laws."

That case distinguishes the case of United States v. Frank Black Spotted Horse, D. C., 282 F. 349, which reached a contrary conclusion as being based upon an Act of the South Dakota legislature ceding jurisdiction over the lands there in question to the United States government and an Act of Congress assuming jurisdiction. The court in that case held that federal jurisdiction extended over the reservation as it existed at the time the state ceded jurisdiction to the federal government. The later case of Kills Plenty v. United States, 8 Cir., 133 F. (2d) 292, was also based upon the same law in South Dakota and the same federal statute assuming jurisdiction and concluded that it was not controlled by the ruling in the Johnson case which dealt with a different federal statute.

As to the Flathead Indian reservation, the case of Clairmont v. United States, 225 U. S. 551, 32 S. Ct. 787, 56 L. Ed. 1201, should settle the question as to what the law was before the 1948 amendment. It held specifically that when the Congress of the United States granted to the railroad company the fee

in the land constituting the railroad right-of-way it was no longer Indian country and that a person could not be convicted of the crime of introducing liquor into the Indian country by having it in his possession on the train on the right-of-way.

It seems axiomatic that if the state had jurisdiction over the property in 1948 Congress could not recapture that jurisdiction without some action on the part of the state. But in my opinion the 1948 Act of Congress, Title 18, U. S. C. A., sec. 1151, was but a recodification of the federal statutes and the same did not make any amendment to existing laws. That section reads: "Except as otherwise provided in sections 1154 and 1156 of this title, the term 'Indian country', as used in this chapter, means (a) all land within the limits of any Indian reservation under the jurisdiction of the United States government, notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation, (b) all dependent Indian communities within the borders of the United States whether within the original or subsequently acquired territory thereof, and whether within or without the limits of a state, and (c) all Indian allotments, the Indian titles to which have not been extinguished, including rights-of-way running through the same."

As will be noted under this statute in order for a place to be "Indian country" it must be under the jurisdiction of the United States government.

But it is contended that the clause "notwithstanding the issuance of any patent," has changed the rule as it stood previously. I think that phrase must be construed as meaning and referring to either a trust patent or a patent restricting the power of alienation as those terms were defined in United States v. Ramsey, 271 U. S. 467, 46 S. Ct. 559, 70 L. Ed. 1039, and that the phrase does not comprehend a patent extinguishing the Indian title. In other words the phrase "notwithstanding the issuance of any patent," obviously means such patent as leaves the land under the jurisdiction of the United States. I think too that subdivision (c) of this statute so declares.

But if the amended statute were intended to work a change in the definition of Indian country, I think for the reasons set out in my dissenting opinion on rehearing in State v. Pepion, Mont., 230 Pac. (2d) 961, it was and is ineffectual as an attempt to reinvest jurisdiction in the federal government without action by the state of Montana.

I have examined all the authorities relied on in the majority opinion and find they are all distinguishable or inapplicable to the facts here presented. Konaha v. Brown, 7 Cir., 131 F. (2d) 737, involved a crime committed on a highway. The conclusion was proper because the grant made by the government simply amounted to an easement, a right to build and maintain a highway. There was no relinquishment of jurisdiction or passing of the Indian title such as we have here. In Yohyowan v. Luce, D. C., 291 F. 425, the crime was committed on allotted land, title to which was held in trust by the government. The defendant as well as the person whom he was alleged to have killed were both Indians. In Tooisgah v. United States, 10 Cir., 186 F. (2d) 93, the accused was a full-blood Indian. He had been convicted of murdering another full-blood Indian. The crime was committed on land embraced within an Indian allotment where final patent had not yet been issued. The federal circuit court held that even then the federal district court had no jurisdiction because the reservation as such had been dissolved.

The case of Ex parte Pero and Moore, 7 Cir., 99 F. (2d) 28, has nothing to do with the question before us. The only question before the court in that case was whether the two persons there involved were Indians. The crime involved admittedly took place on the reservation. The case had nothing to do with the question whether property as to which the Indian title had been extinguished was still a part of the reservation or Indian country.

The fallacy of the majority opinion in the instant case rests in the fact that it assumes that land within the exterior boundaries of an Indian reservation is still a part of the reservation although the Indian title has been extinguished by the granting of a title in fee by the federal government.

By denying jurisdiction to the state courts in this case we are in effect declaring an open season for burglary in favor of the Indians as against property situated as the "Super Foods" store in Ronan.

I think the federal courts will properly deny federal jurisdiction and we will have repetition of the case of State v. Tully, 31 Mont. 365, 78 Pac. 760; United States v. Tully, C. C., 140 F. 899, where both the state and federal courts denied jurisdiction.

I think Judge Comer ruled properly in sustaining the jurisdiction of the state court and the judgment entered on the plea of guilty.